# Effects of a Presidential Pardon

A full and unconditional presidential pardon precludes the exercise of the authority to deport a convicted alien under 8 U.S.C. § 1251(a)(2).

A full and unconditional presidential pardon removes a state firearm disability arising as a result of a conviction of a federal crime.

A full and unconditional presidential pardon extends to the remission of restitution ordered by a court pursuant to 18 U.S.C. § 3551(b)-(c) as a "sanction" authorized in addition to imprisonment, probation, or a fine until such time as the restitution award is paid to the victim.

June 19, 1995

MEMORANDUM FOR THE PARDON ATTORNEY

This memorandum responds to your request for our opinion concerning whether a full and unconditional presidential pardon precludes the exercise of the authority to deport a convicted alien under 8 U.S.C. § 1251(a)(2),\* removes a state firearm disability arising as a result of conviction of a federal crime, or extends to the remission of court-ordered criminal restitution not yet received by the victim of the pardoned offender. We answer all three questions in the affirmative.

## I.

### A.

Your first question requires us to examine the effect of a presidential pardon on the deportability of an alien on the ground that he or she has been convicted of certain crimes. Section 1251(a) of title 8 describes the classes of aliens who "shall, upon order of the Attorney General, be deported." The various criminal convictions that make an alien deportable are set forth in subsections (A)-(D) of § 1251(a)(2). Subsection 1251(a)(2)(A)(iv) waives the application of subsection (A) (involving crimes of "moral turpitude" and "aggravated felonies") for any offender who "has been granted a full and unconditional pardon by the President of the United States or by the Governor of any of the several States." The statute is silent, however, as to the effect of such a pardon on the convictions listed in subsections (B)-(D), which include offenses involving controlled substances, firearms, and miscellaneous crimes.

The Immigration and Naturalization Service takes the position that a pardon only removes the authority to deport an alien whose conviction falls within sub-

---

\* Editor's note: At the time this memorandum was issued, section 1251 of title 8, United States Code, codified section 241 of title II of the Immigration and Naturalization Act ("INA"). Subsequently, on September 30, 1996, that section was redesignated as section 237 of the INA, and was thereafter recodified as 8 U.S.C. § 1227. *See* Pub. L. No. 104-208, § 305(a)(2), 110 Stat. 3009, 3009-598 (1996).

section (A). Although the statute only addresses the effect of a pardon with respect to crimes involving moral turpitude and aggravated felonies, that conclusion does not end the analysis of this issue, because congressional legislation cannot define or limit the effect of a presidential pardon. As Acting Attorney General John W. Davis opined in a similar context:

> The fact that by the act of August 22, 1912, Congress expressly recognized the right of the President to remit such penalties ''where the offense was committed in time of peace and where the exercise of such clemency will not be prejudicial to the public interest'' can not affect the power of the President, which exists independently of legislative recognition, to remit such penalties by pardon, whether the offense [was] committed in time of peace or in time of war.

*Naval Service—Desertion—Pardon*, 31 Op. Att'y Gen. 225, 232 (1918); *see also Ex Parte Garland*, 71 U.S. (4 Wall.) 333, 380 (1866) (''This power of the President [i.e., the pardon power] is not subject to legislative control. Congress can neither limit the effect of his pardon, nor exclude from its exercise any class of offenders. The benign prerogative of mercy reposed in him cannot be fettered by any legislative restrictions.''). Thus, the question raised by your request is not a matter of statutory interpretation, but instead entails consideration of the scope of the President's pardon authority under the Constitution.

Article II, section 2 of the Constitution authorizes the President ''to grant Reprieves and Pardons for Offenses against the United States, except in Cases of Impeachment'' (the ''Pardon Clause''). In *Ex Parte Garland*, the Supreme Court summarized the reach of a presidential pardon as follows:

> A pardon reaches both the punishment prescribed for the offence and the guilt of the offender; and when the pardon is full, it releases the punishment and blots out of existence the guilt, so that in the eye of the law the offender is as innocent as if he had never committed the offence. If granted before conviction, it prevents . . . the penalties and disabilities consequent upon conviction from attaching; if granted after conviction, it removes the penalties and disabilities, and restores him to all his civil rights; it makes him, as it were, a new man, and gives him a new credit and capacity.

*Garland*, 71 U.S. at 380–81. This broad interpretation of the effect of a pardon was affirmed in *Knote v. United States*, 95 U.S. 149 (1877), in which the court stated:

> A pardon is an act of grace by which an offender is released from the consequences of his offense, so far as such release is practicable and within control of the pardoning power, or of officers under its direction. It releases the offender from all disabilities imposed by the offense, and restores to him all his civil rights. In contemplation of law, it so far blots out the offence, that afterwards it cannot be imputed to him to prevent the assertion of his legal rights.

*Id.* at 153.

A presidential pardon relieves the offender of all punishments, penalties, and disabilities that flow directly from the conviction, provided that no rights have vested in a third party as a consequence of the judgment. In *Boyd v. United States*, 142 U.S. 450 (1892), for example, the defense objected to the testimony of a witness who had been convicted of larceny. In response, the prosecution presented a full and unconditional pardon issued by President Harrison. The Court held that the pardon restored the competency of the witness to testify. "The disability to testify being a consequence, according to the principles of the common law, of the judgment of conviction, the pardon obliterated that effect." *Id.* at 453–54.

This conclusion is supported by the English common law from which the framers drew their understanding of the scope of the power being granted the Chief Executive. The Pardon Clause of the Constitution was derived from the pardon power held by the King of England at the adoption of the Constitution. Accordingly, the Supreme Court has repeatedly looked to English cases for guidance in interpreting the effect of a pardon. *See, e.g., Schick v. Reed*, 419 U.S. 256, 262–63 (1974); *Ex Parte Wells*, 59 U.S. (18 How.) 307, 310–11 (1855). At common law it was well settled that a pardon by the king removed not only the punishment that flowed from the offense, but also "all the legal disabilities consequent on the crime." 7 Matthew Bacon, *A New Abridgment of the Law* 416 (1852); *see, e.g., Cuddington v. Wilkins*, 80 Eng. Rep. 231, 232 (K.B. 1614) ("[T]he King's pardon doth not only clear the offence it self, but all the dependencies, penalties, and disabilities incident unto it.").

Based on the foregoing analysis, we believe that a deportation order authorized by § 1251(a)(2) is a consequence of a conviction that is precluded by a full and unconditional presidential pardon. Section 1251(a)(2) does not render a person deportable based on the conduct in which he or she engaged. Rather, this provision establishes an additional penalty that attaches solely because of the conviction. Thus, a person who engaged in the conduct prohibited by the relevant criminal statutes but was never convicted of the crime would not be deportable on the basis of this provision; the authority to deport hinges completely on the fact of conviction. Therefore, a presidential pardon would preclude the imposition of the penalty.

We have considered the possible argument that deportation pursuant to § 1251(a)(2) is not precluded by a pardon because the statute does not impose a penalty or disability based on an offense but rather only implements a decision regarding conduct Congress has deemed inconsistent with the qualifications aliens must have to remain in the country. Although in interpreting the pardon power the Supreme Court has never expressly adopted a distinction between penalties that a pardon can remove and qualifications that a pardon does not affect, the Attorneys General and lower courts have invoked it.

For example, in 1898, Attorney General Griggs was asked to consider the effect of a presidential pardon on the administration of a statute that prohibited the reenlistment of any soldier "'whose service during his last preceding term of enlistment ha[d] not been honest and faithful.'" *Army—Enlistment—Pardonk,* 22 Op. Att'y Gen. 36, 37 (1898) (quoting Act of Aug. 1, 1894, ch. 179, §2, 28 Stat. 215, 216). The soldier in question had been discharged after being convicted of desertion from military service. Subsequently, he was pardoned by the President and sought reenlistment. Because Congress may prescribe qualifications and conditions for military service, Attorney General Griggs sought to determine whether the statute in question set such a qualification or attempted to impose additional disabilities on the offender because of the conviction. He concluded that application of the statute to a pardoned soldier was permissible because it did not seek to prevent reenlistment because of the commission of a criminal offense. Rather, he found that the statute's prohibition related to "previous conduct in service and affect[ed] the personal rather than the criminal character of the applicant." *Id.* at 39. Where a statute "is properly to be regarded as a rule relating to qualification[s] for office," a later opinion concluded, and "does not impose a penalty as such on individual offenders . . . the incidental disabilities which they may suffer by reason of the statute are not removed by a pardon." 31 Op. Att'y Gen. at 230; *accord Effect of Pardon on Statute Making Persons Convicted of Felonies Ineligible for Enlistment in the Army,* 39 Op. Att'y Gen. 132 (1938). In contrast, "where a statute although purporting to prescribe qualifications for office has no real relation to that end but is obviously intended to inflict punishment for a past act," a presidential pardon will abate that punishment. 31 Op. Att'y Gen. at 229.[1]

---

[1] The decision of the Supreme Court in *Garland* illustrates this distinction. In *Garland,* at issue was an act of Congress that attempted to exclude from the practice of law all persons who had participated in the Rebellion. The Court determined that this exclusion was a punishment for the offense of treason. In other words, the Court concluded that, despite Congress's attempt to present its Act as setting qualifications for a profession, it was actually an attempt to exact additional punishment for an offense. The Court held that the Act could not be applied to *Garland* because the President's pardon prohibited the plaintiff from being punished for the offense of treason. To hold that he could be punished under this new law would subvert the President's clemency power. As the Court stated, "[i]f such exclusion can be effected by the exaction of an expurgatory oath covering the offense, the pardon may be avoided, and that accomplished indirectly which cannot be reached by direct legislation. It is not within the constitutional power of Congress thus to inflict punishment beyond the reach of executive clemency." *Garland,* 71 U.S. at 381; *see also United States v. Klein,* 80 U.S. (13 Wall.) 128 (1871). Accordingly, any punishment Congress attempted to prescribe for guilt for the offense was not applicable to the plaintiff.

163

Professor Samuel Williston drew essentially the same distinction in an early and seminal article, reasoning that:

> [I]f the mere conviction involves certain disqualifications which would not follow from the commission of the crime without conviction, the pardon removes such disqualifications. On the other hand, if character is a necessary qualification and the commission of [the] crime would disqualify even though there had been no criminal prosecution for the crime, the fact that the criminal has been convicted and pardoned does not make him any more eligible.

Samuel Williston, *Does a Pardon Blot Out Guilt?*, 28 Harv. L. Rev. 647, 653 (1915). In recent decades, several federal courts of appeals have endorsed Williston's view. *See, e.g., United States v. Noonan*, 906 F.2d 952, 958–59 (3d Cir. 1990); *Bjerkan v. United States*, 529 F.2d 125, 128 n.2 (7th Cir. 1975).

It is clear that deportation based on § 1251(a)(2) operates solely on the basis of the conviction of crime and therefore falls within the type of consequence that is removed by a pardon under the Williston distinction. The provision creates a "disqualification[ ] which would not follow from the commission of the crime without conviction." 28 Harv. L. Rev. at 653. A person who engaged in the conduct prohibited by the relevant criminal statutes but was never convicted of the crime would not be deportable on the basis of this provision. Rather, § 1251(a)(2) excludes only those aliens who have been convicted. As such, its application to a pardoned alien is impermissible.[2]

## B.

You have asked us to address specifically whether a pardon removes only the consequences of a conviction or whether it also removes the consequences of an offense even where there has not yet been a conviction. Throughout the Nation's history, Presidents have asserted the power to issue pardons prior to conviction, and the consistent view of the Attorneys General has been that such pardons have as full an effect as pardons issued after conviction. *See, e.g., Pardoning Power of the President*, 6 Op. Att'y Gen. 20 (1853); *Pardons*, 1 Op. Att'y Gen. 341 (1820). Indeed, in two of the best-known exercises of the pardon power (President

---

[2] It might also be argued that because deportation is not punishment, it is not precluded by a presidential pardon. This argument has been suggested in dicta in two court opinions. *Kwai Chiu Yuen v. INS*, 406 F.2d 499 (9th Cir.) *cert. denied*, 395 U.S. 908 (1969); *United States ex rel. Brazier v. Commissioner of Immigration*, 5 F.2d 162 (2d Cir. 1924); In each instance, the court relied on the Supreme Court's statement in *Mahler v. Eby*, 264 U.S. 32, 39 (1924), that deportation "is not punishment" for purposes of the Ex Post Facto Clause of the Constitution (art. I, §9), to suggest that a presidential pardon does not preclude deportation. *Kwai Chiu Yuen*, 406 F.2d at 502; *Brazier*, 5 F.2d at 164. We disagree with this argument because we believe that a presidential pardon removes all adverse consequences of conviction that can be viewed as punishments, penalties, or disabilities that attach by reason of the conviction, regardless of whether they are viewed as "punishment" for purposes of invoking other constitutional provisions.

Andrew Johnson's offer of pardons to persons involved in secession but willing to take an oath of loyalty, and President Jimmy Carter's pardon of persons who avoided military service during the Vietnam War), the vast majority of those pardoned had not been convicted of any crime.

The language of the Court's opinion in *Garland* is instructive on this issue:

> A pardon reaches both the punishment prescribed for the offence and the guilt of the offender; and when the pardon is full, it releases the punishment and blots out of existence the guilt [for the offense], so that in the eye of the law the offender is as innocent as if he had never committed the offence.

*Garland*, 71 U.S. at 380 (emphasis added). We understand this passage to mean that a pardon removes or prevents the attachment of all consequences that are based on guilt for the offense. In the great majority of cases, a pardon comes after a conviction; thus, there has already been a finding of guilt in the criminal justice process. It is important to understand, however, that the pardon is for the *guilt* for an offense, not just the *conviction* of the offense. Thus, a pardon for an offense that is issued prior to a conviction has the same effect as one that is issued after a conviction. Any consequences that would have attached had there been a conviction are precluded.[3]

The foregoing analysis does not mean that a pardoned person cannot be held accountable for the conduct underlying the offense by a governmental entity seeking to determine suitability for a position of confidence or trust, adherence to a code of conduct, or eligibility for a benefit. In *Garland* the Court stated that a pardon makes "the offender . . . as innocent as if he had never committed the *offense.*" *Id.* (emphasis added). We do not interpret this to mean that the pardon creates the fiction that the *conduct* never took place. Rather, a pardon represents the Executive's determination that the offender should not be penalized or punished for the offense. There may be instances where an individual's conduct constitutes not only a federal offense, but also a violation of a separate code of conduct or ethics that the individual is obligated to comply with by virtue of

---

[3] Consequences that attach simply by reason of an *indictment* for an offense generally are not precluded by a pardon. Although the consequence is identified with reference to an offense, it generally is not based on guilt for the offense. For example, in *In re North*, 62 F.3d 1434 (D.C. Cir. 1994), the court considered the application to a pardoned individual of the provision of the Independent Counsel Act, 28 U.S.C. §§ 591–599, that authorizes the payment of attorneys' fees to any person who is investigated by an Independent Counsel, *see* 28 U.S.C. § 593(f)(1). The petitioner claimed that, by virtue of a presidential pardon, he was entitled to be reimbursed for attorneys' fees since those fees would have been paid by the government had he not been *indicted* for the offense. In concluding that the pardon did not restore his right to attorneys' fees, the court relied on the rule enunciated in *Knote*, 95 U.S. at 154: the President's exercise of the pardon power is subject to the constitutional requirement that money may not be withdrawn from the Treasury in the absence of a congressional appropriation. The court could also have reached the same conclusion by the reasoning we suggest here. The petitioner would not have been entitled to reimbursement of his attorneys' fees even if he had been found not guilty of the offense at trial. The pardon, therefore, had no effect on his entitlement to payment of attorneys' fees because the refusal to pay attorneys' fees was not a consequence of his guilt for the offense.

his or her professional license. Discipline associated with the breach of the conditions of a professional license, where the disciplinary action is not triggered merely by the fact of commission or conviction of a federal offense, generally would not be barred by a pardon.

For example, an attorney charged with a criminal offense for which he or she is later pardoned by the President would be relieved of all consequences that attached solely by reason of his commission of the offense. However, the pardon would not necessarily prevent a local or state bar from disciplining the attorney, if it independently determined that the underlying conduct, or some portion of it, violated one of its canons of ethics. In those instances, the bar would not have based its decision to disbar or sanction the attorney on the fact that the attorney had violated the criminal laws of the United States, but rather would have conducted an inquiry into the conduct and determined that an ethical violation had occurred. Several state courts have taken this approach when considering the effect of a gubernatorial pardon on state disbarment proceedings. *See e.g., In re Bozarth,* 63 P.2d 726 (Okla. 1936); In re Lavine, 41 P.2d. 161 (Cal. 1935); *Nelson v. Commonwealth,* 109 S.W. 337 (Ky. 1908).

## II.

Your second question requires us to determine whether a full and unconditional pardon removes firearms disabilities imposed by a state as a result of a conviction of a federal crime. The materials submitted with your opinion request suggest that the typical disability statute makes it an offense for a person convicted of a state or federal offense to own, possess, or have custody or control of a firearm.[5] *See* Office of the Pardon Att'y, U.S. Dept. of Justice, Civil Disabilities of Convicted Felons: A State-By-State Survey (1992).

Our conclusion in section I that a presidential pardon removes all punishments, penalties, and disabilities that attach solely by reason of a federal offense necessarily requires the conclusion that a pardon removes state firearms disabilities based solely on a federal offense, so long as we can answer affirmatively the question whether the President's pardon power extends beyond federal consequences to include consequences imposed by a state. This question was addressed by the Supreme Court in *Carlesi v. New York,* 233 U.S. 51 (1914). In *Carlesi,* the Court was asked to determine whether the fact that the plaintiff had received a presidential pardon for a federal offense prevented a state from treating the plaintiff as a "second offender" for the purposes of punishment for a subsequent state offense. Writing for a unanimous Court, Chief Justice White stated:

---

[5] For example, a Colorado statute provides that any person convicted under the laws of a state, or of the United States, of certain crimes within the past ten years or within ten years of release from confinement, may not possess, use or carry on his person a firearm or other weapon prohibited by the firearms laws. Colo. Rev. Stat. Ann. § 18–12–108.

It may not be questioned that the States are without right directly or indirectly to restrict the National Government in the execution of its legitimate powers. It is therefore to be conceded that if the act of the State in taking into consideration a prior conviction of an offense committed by the same offender against the laws of the United States despite a pardon was in any just sense a punishment for such prior crime, that the act of the State would be void because destroying or circumscribing the effect of the pardon granted under the Constitution and [the] laws of the United States.

*Id.* at 57. Ultimately, the Court concluded that the state was not seeking to impose additional punishment for the pardoned offense, but rather had made the conduct underlying that offense an aggravating circumstance for purposes of determining the punishment for the second offense. *See id.* at 59. However, it is clear from the above-quoted passage that if the Court had determined that the state was attempting to punish or penalize the offender for the pardoned offense, the state's action would have been a violation of the Constitution. At least one federal court of appeals has expressly adopted this position. In *Bjerkan*, the Seventh Circuit, relying on the Court's dicta in *Carlesi*, held that "a presidential pardon restores state as well as federal civil rights." 529 F.2d at 129. The court stated that once a federal offense has been pardoned, any "attempted punishment [by a state] would constitute a restriction on the legitimate, constitutional power of the President to pardon an offense against the United States and would be void as circumscribing and nullifying that power." *Id.* at 128.

The conclusion that a presidential pardon relieves a federal offender of state firearms disabilities that attach solely by reason of a federal conviction is supported by federal supremacy principles based on the Supremacy Clause of the Constitution. U.S. Const. art. VI, cl. 2. The Pardon Clause gives the President exclusive jurisdiction in the issuance of pardons and reprieves for offenses against the United States. *See Schick*, 419 U.S. at 266–67. Accordingly, the Supreme Court has held repeatedly that Congress may not act in any manner that would limit the full legal effect of a presidential pardon. *See, e.g., Klein*, 80 U.S. at 148; *Garland*, 71 U.S. at 380. The same conclusion is required with respect to acts of a state that would limit or destroy the effect of a presidential pardon. When the President issues a pardon pursuant to this constitutional authorization, the pardon preempts any inconsistent state laws, regulations, or actions. In its sphere — offenses against the United States — the President's pardon power "must be supreme. It cannot be hindered by the operation of the subordinate governments. The pardon power would be ineffective if it could only restore a convict's federal civil rights." *Bjerkan*, 526 F.2d at 129; *see also Harbert v. Deukmejian*,

173 Cal. Rptr. 89 (Cal. Ct. App. 1981) (state firearm disability does not apply to a person who has received a full and unconditional presidential pardon).[5]

## III.

Your third question concerns whether a full and unconditional presidential pardon extends to the remission of restitution ordered by a court pursuant to 18 U.S.C. § 3551(b)-(c) as a "sanction" authorized in addition to imprisonment, probation, or a fine.[6] This question, to our knowledge, has not been decided by any court, but we conclude, based upon existing precedent, that a pardon does reach such restitution where the victim has not yet received the restitution award, provided the pardon does not contain an express limitation to the contrary.[7]

Although a pardon is a full forgiveness of punishment, there is a limitation on this power. As the Supreme Court explained in *Osborn v. United States*, 91 U.S. 474, 477 (1875):

> If in the proceedings to establish [the offender's] culpability and enforce the penalty, and before the grant of the pardon, the rights of others than the government have vested, those rights cannot be impaired by the pardon. The government having parted with its power over such rights, they necessarily remain as they existed previously to the grant of the pardon. The government can only release what it holds.

*See also Knote*, 95 U.S. at 153–55; *Garland*, 71 U.S. at 381; *cf. Hodges v. Snyder*, 261 U.S. 600, 603 (1923) (holding that the private rights of a party that have been vested by the judgment of a court cannot be taken away by subsequent legislation); *Pennsylvania v. Wheeling & Belmont Bridge Co.*, 59 U.S. (18 How.) 421, 431 (1855) (same). Thus, whether the restitution order is remitted by the pardon depends on whether the order creates a vested right for the victim.

---

[5] An 1856 opinion of Attorney General Cushing concludes that a presidential pardon does not extend to legal or political disabilities imposed by one of the states. *Pardons*, 7 Op. Att'y Gen. 760 (1856). However, we decline to follow that opinion because we disagree with the approach it takes on a number of issues. First of all, without any discussion of the scope of the pardon power, the opinion simply accepts the petitioner's assumption that a presidential pardon does not by itself remove a disability imposed by a state on the basis of a federal conviction. More fundamentally, the opinion is inconsistent with the subsequent Supreme Court opinion in *Carlesi*, modern concepts of federalism, and our analysis of the effect of a presidential pardon.

[6] Subsections (b) and (c) of § 3551 permit a "[s]anction authorized by [18 U.S.C. §] 3556." Section 3556, in turn, permits a sentence requiring "the defendant [to] make restitution to any victim of the offense in accordance with the provisions of . . . [18 U.S.C. §§] 3663 and 3664." The latter sections impose an elaborate set of procedural and substantive requirements upon the sentencing court concerning the imposition of restitution. Thus, 18 U.S.C. § 3551(b)-(c) effectively incorporate by reference the requirements of 18 U.S.C. §§ 3663 and 3664.

[7] Clearly, the President may grant a pardon on the condition that the offender pay any court-ordered restitution imposed before the pardon was issued. However, the President must expressly state any limitation or condition that he wishes to impose because a pardon is presumed to reach all punishment resulting from an offense. Indeed, even when a limitation is expressly stated, any ambiguity must be construed in favor of the beneficiary of the pardon. *See Knote*, 95 U.S. at 151.

A vested right is one the conferral of which is complete and consummated. *See, e.g., Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 162 (1803). With respect to rights affected by a presidential pardon, the Court has stated:

> Where . . . property condemned, or its proceeds, have not . . . vested, but remain under control of the Executive, or of officers subject to his orders, or are in the custody of the judicial tribunals, the property will be restored or its proceeds delivered to the original owner, upon his full pardon. The property and the proceeds are not considered as so absolutely vesting in third parties or in the United States as to be unaffected by the pardon until they have passed out of the jurisdiction of the officer or tribunal. The proceeds have thus [vested] when paid over to the individual entitled to them, in the one case, or are covered into the treasury, in the other.

*Knote*, 95 U.S. at 154. Thus, we do not believe that restitution orders issued pursuant to 18 U.S.C. § 3551(b)-(c) create vested rights in victims until the victims actually receive the award. Prior to that time, the victim does not exercise the complete control over the property required for a right to be vested.

Although 18 U.S.C. § 3663(h) provides victims with civil remedies to collect restitution, it does not make restitution a civil judgment that a court may not revoke. To the contrary, a restitution order results from a criminal proceeding that adjudicates guilt and it is issued as part of the offender's sentence. Its character is undeniably penal rather than compensatory. As the Court reasoned in *Kelly v. Robinson*, 479 U.S. 36 (1986):

> Although restitution does resemble a judgment ''for the benefit of'' the victim, the context in which it is imposed undermines that conclusion. The victim has no control over the amount of restitution awarded or over the decision to award restitution. Moreover, the decision to impose restitution generally does not turn on the victim's injury, but on the penal goals of the State and the situation of the defendant.

*Id.* at 52. Thus, the Eleventh Circuit has held that a victim does not have Article III standing to challenge the revocation of a restitution order. *United States v. Johnson*, 983 F.2d 216 (11th Cir. 1993). Other courts have relied on similar reasoning to deny alleged victims standing to challenge the terms of a restitution order under both the Constitution and 18 U.S.C. §§ 3663-3664. *See United States v. Kelley*, 997 F.2d 806 (10th Cir. 1993); *United States v. Grundhoefer*, 916 F.2d 788 (2d Cir. 1990).

Based on these decisions, it is clear that a victim does not have complete control over a restitution award prior to receiving it. Rather, he or she is allowed to collect

only pursuant to the terms set forth by the court. Thus, no rights or interests vest in the victim upon the issuance of a restitution order. Because a pardon eliminates all penalties that do not create vested rights in a third party, we conclude that a full and unconditional presidential pardon has the effect of remitting court-ordered criminal restitution that has not yet been received by the victim.

Of course, as should already be clear from the foregoing discussion, the pardon cannot remit a restitution award that the victim has received. Once the victim takes possession, the Executive no longer has control over the award. As the Court stated in Knote, ''if the proceeds of the sale have been paid to a party to whom the law has assigned them, they cannot be subsequently reached and recovered by the offender. The rights of the parties have become vested, and are as complete as if they were acquired in any other legal way.'' 95 U.S. at 154. Therefore, any restitution awards that have been received by the victim prior to the granting of the pardon are not recoverable by the offender.

## IV.

For the foregoing reasons, we conclude that a full and unconditional pardon precludes the exercise of the authority to deport a person pursuant to 8 U.S.C. § 1251(a)(2), removes firearms disabilities imposed by a state solely by reason of a federal conviction, and remits restitution awarded pursuant to 18 U.S.C. § 3551(b)-(c) where the victim has not yet received the award. We note, however, that the President can leave undisturbed any of these consequences by expressly stating that their continued existence is a condition of the pardon.

WALTER DELLINGER
*Assistant Attorney General*
*Office of Legal Counsel*